UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN MARC RUBIN, <br><br> Defendant. | Civil Action No. 23-cv-15013 |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges as follows against Defendant Brian Marc Rubin ("Rubin" or "Defendant"):

## SUMMARY OF THE ACTION

1. Rubin engaged in illegal insider trading in Array BioPharma Inc. ("Array") securities in advance of an announcement that Pfizer Inc. ("Pfizer") was acquiring Array via a tender offer (the "Acquisition"). Specifically, Rubin unlawfully traded Array stock options based on material, nonpublic information about the Acquisition that he learned about and then misappropriated from his spouse, who worked at Array. Rubin traded the Array stock options prior to the June 17, 2019 announcement of the Acquisition, and as a result made illegal profits of $90,458.

2. By engaging in the conduct alleged in this Complaint, Rubin violated, and unless enjoined will continue to violate, Sections 10(b) and 14(e) of the Securities Exchange Act of

1

1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 and 240.14e-3].

3.      The SEC seeks a final judgment: (a) permanently enjoining Rubin from violating the federal securities laws and rules alleged in this Complaint; (b) ordering Rubin to disgorge any ill-gotten gains he received as a result of insider trading, with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and (d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Rubin to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other and further relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

4.      The SEC brings this action pursuant to the authority conferred upon it by Sections 21(d), 21(e), and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78u-1].

5.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

6.      Rubin, directly and indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Rubin resides within this District. In addition, many of the acts, practices, and courses of business constituting the violations alleged herein occurred within this District, including Rubin misappropriating the material, nonpublic information from his spouse and submitting the trades to his brokerage account.

## DEFENDANT

8.      **Brian Marc Rubin**, age 51, resides in Deerfield, Illinois. At the time of his illegal Array stock option trades, Rubin was unemployed. Rubin worked as an options trader in the 1990s and early 2000s.

## RELEVANT ENTITIES

9.      **Array BioPharma Inc.**, was, prior to the Acquisition, a Delaware corporation with its principal place of business in Boulder, Colorado. Array developed, marketed, and distributed pharmaceuticals to treat patients afflicted with cancer and other high-burden diseases. Array's securities were, at the time of Rubin's trades, registered pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ Global Market under the symbol "ARRY."

10.     **Pfizer Inc.** is a Delaware corporation with its principal place of business in New York, New York. Pfizer is a global biopharmaceutical company. Pfizer acquired Array on July 30, 2019. Pfizer's securities are registered pursuant to Section 12(b) of the Exchange Act and trade on the New York Stock Exchange under the symbol "PFE."

## TRADING TERMINOLOGY

11.     Stock is a form of equity ownership in a corporation and it is a security as defined by Section 2(a)(1) of the Securities Act of 1933 ("Securities Act").

12.     Options contracts are financial instruments that offer the buyer an opportunity to buy or sell – depending upon the type of options contract – an underlying asset such as stock. An options contract on a security, such as stock, is also a security under Section 2(a)(1) of the Securities Act.

13.     A put stock option is a specific type of options contract that gives the owner the right, but not the obligation, to sell 100 shares of the underlying stock at a set price per share, known as the option's strike price, on or before a set future date, known as the option's

expiration date. Buying a put option becomes profitable if the stock price falls below the strike price prior to the expiration date.

14.     A short put is a type of options trade in which the trader sells – *i.e.*, writes – a put option. The profit on this type of trade is limited to the premium (option cost) received by the writer of the put option. However, shorting a put option can subject the trader to significant losses if the stock price falls below the strike price prior to the expiration date.

15.     A call stock option is a specific type of options contract that gives the owner the right, but not the obligation, to buy 100 shares of the underlying stock at a set price per share on or before a set future date. Buying a call option becomes profitable if the stock price rises above the strike price prior to the expiration date.

16.     A call option is considered "out-of-the-money" when the current market price of the underlying stock is lower than its strike price.

## FACTS

**A.     Background**

17.     At all times relevant to this action, Rubin's spouse worked at Array as an Access Accounts Director in the Midwest region. In that role, she was responsible for, among other things, educating medical providers and insurers about Array's products prior to their market launch and gathering market research regarding Array's drugs.

18.     At all times relevant to this action, Rubin and his spouse regularly shared confidences, including information about his spouse's job activities at Array.

19.     At all times relevant to this action, Rubin exercised control over and traded securities within his and his spouse's joint brokerage account (the "Brokerage Account").

**B.**     **Rubin's Spouse Learns that Array Will Likely Be Acquired**

20.     On March 21 and April 23, 2019, Array and Pfizer entered into confidentiality agreements to exchange information relating to the Acquisition. This was a substantial step toward Pfizer making a tender offer for Array shares.

21.     Around that same time, Rubin's spouse learned from her Array colleagues that the company would likely be acquired.

**C.**     **Rubin Purchased Out-of-the-Money Call Options in Array Based on Material, Nonpublic Information He Misappropriated**

22.     Rubin's spouse, who provided her family with a stable income and health insurance benefits, was concerned that if another company acquired Array, she would lose her job.

23.     As a result, prior to May 6, 2019, she told Rubin in confidence that she learned from work colleagues that Array was a likely acquisition target, and that her job would be eliminated if Array were acquired.

24.     Rubin knew or was reckless in not knowing that the information his spouse told him about the potential Acquisition was material, nonpublic information because she had learned the information as part of her job at Array.

25.     Rubin owed a duty of trust or confidence to his wife based on their history, pattern, or practice of sharing and maintaining these types of confidences.

26.     Rubin also knew or was reckless in not knowing that his spouse expected him to keep the information about the Acquisition confidential.

27.     Instead of keeping the information confidential, Rubin traded Array stock options on the basis of the material, nonpublic information he misappropriated from his spouse.

5

28.     Rubin had previously worked as an options trader and understood that he could leverage the value of the material, nonpublic information by trading Array stock options.

29.     On Monday, May 6, 2019, Rubin contacted his investment adviser to obtain options trading authorization in the Brokerage Account.

30.     In order to trade options in the Brokerage Account, Rubin needed both his and his spouse's signatures on the options trading application. Rubin did not tell his spouse that he was going to trade in Array stock options. Nevertheless, Rubin signed both his and his spouse's name on the application so that he could do so.

31.     On May 9, 2019, within an hour of getting options trading approval, Rubin implemented a trading strategy that would allow him to profit from an increase in share price when Array was acquired. The strategy would ordinarily be considered aggressive and risky, had he not been in possession of material, nonpublic information. Rubin first collected a premium by shorting put options in Array stock. Next, Rubin used the proceeds from shorting the put options to buy out-of-the-money call options in Array.

32.     Specifically, on May 9, 2019, when Array stock was trading at $22.02, Rubin shorted put options with a strike price of $17 and purchased out-of-the-money call options with a strike price of $25. Rubin would only make money on the call options if Array's stock price increased at least 13.5% (from $22.02 to $25) before the call options expired. Array's stock had not closed above $25 prior to these trades. Further, Rubin would lose money if the price fell below $17 (a price that Array stock had dipped below as recently as mid-January 2019), because, if it did, he would be forced to acquire Array stock at an above-market price.

33.     On May 29, 2019, Pfizer submitted an initial, nonpublic tender offer bid to Array to acquire all outstanding Array shares at $44 per share and expressed a desire to announce the Acquisition on June 17, 2019.

34.     On June 3, 2019, Rubin again shorted put options in Array stock and used the proceeds to buy additional out-of-the-money call options in Array. However, Rubin's trading strategy on June 3, 2019, was even more aggressive than his prior Array stock options trades because the put options had a higher strike price of $22 (Array's stock had closed below $22 as recently as May 20, 2019) and the call options were deeper out-of-the-money, requiring an approximately 24.5% increase in the stock price (from $28.12 to $35) for the calls to become profitable. Array's stock had not closed above $35 prior to these trades.

35.     At the time Rubin placed the Array stock options trades in the Brokerage Account, Rubin's investment adviser, because he knew that Rubin's spouse worked for Array, asked Rubin whether he was in possession of material, nonpublic information regarding Array. In response, Rubin falsely stated that he was not.

36.     Rubin's May 9 and June 3, 2019, stock option trades were the first and only stock options trades in the Brokerage Account since it was opened in 2013.

37.     Before the markets opened on June 17, 2019, Pfizer announced that it would acquire Array by tender offer at $48 per share. When the markets opened following the announcement, Array's stock price rose nearly 57%, from $29.59 (Array's closing price the day before the announcement), to $46.44 (the closing price on the day of the announcement).

38.     After the Acquisition was consummated on July 30, 2019, Rubin's stock option positions were closed out, generating profits of $90,458. The investment returns Rubin achieved on the Array stock options are aberrant when compared with his other trades in the Brokerage Account. For example, while Rubin realized a 688% return from the Array call options, he realized losses in every other equity trade (other than Array) that he opened and closed from October 2017 to January 2020. In addition, except for his profits in Array stock and options, Rubin lost money in his trades of other biotechnology stocks during this same period.

**D.     Rubin Engaged in Illegal Insider Trading**

39.     At the time of his trading described above, Rubin owed a duty of trust and confidence to his wife, based on their relationship, which included a history, pattern, and practice of sharing confidences.

40.     Rubin obtained material, nonpublic information about the potential Acquisition from his spouse, who learned about it from her employment.

41.     A reasonable investor would have viewed the information about the potential Acquisition, learned from an Array employee, as being important to the decision of whether to invest in Array securities.

42.     Rubin knew or was reckless in not knowing that the information he obtained about the potential Array acquisition was material, nonpublic information and that he owed a duty of trust and confidence to his spouse not to trade Array securities on the basis of that information.

43.     By trading Array stock options after learning information related to the potential Acquisition, Rubin misappropriated material, nonpublic information for securities trading purposes, in breach of a duty of trust and confidence he owed to his wife.

8

## FIRST CLAIM FOR RELIEF

**Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

44.    The SEC realleges and incorporates by reference paragraphs 1 through 43 as though fully set forth herein.

45.    By engaging in the conduct described above, Rubin, in connection with the purchase and sale of securities, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person, including purchasers and sellers and prospective purchasers and sellers of securities.

46.    By engaging in the foregoing conduct, Rubin violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violation of Exchange Act Section 14(e) and Rule 14e-3 Thereunder
[15 U.S.C. § 78n(e) and 17 C.F.R. § 240.14-3]**

47.    The SEC realleges and incorporates by reference paragraphs 1 through 43.

48.    After Pfizer had taken substantial steps to commence a tender offer for Array's stock, Rubin purchased Array stock options while in possession of material information relating

to the tender offer that he knew or had reason to know was nonpublic, and which Rubin knew or had reason to know had been acquired, directly or indirectly, from the target company of the tender offer, Array, via an employee of Array before such information and its source were publicly disclosed.

49.     By engaging in the foregoing conduct, Rubin violated, and unless enjoined will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14-3].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Rubin committed the violations charged and alleged herein;

### II.

Issue an Order permanently restraining and enjoining Rubin from, directly or indirectly, engaging in conduct in violation of Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 CFR §§ 240.10b-5 and 240.14-e3];

### III.

Issue an Order requiring Rubin to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received because of the conduct alleged in this Complaint, pursuant to Section 21(d)(5) and (d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (d)(7)];

### IV.

Issue an Order requiring Rubin to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**V.**

Retain jurisdiction of this action in accordance with principles of equity and the Federal Rules of Civil Procedure to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**VI.**

Grant such other relief as this Court deems appropriate.

Respectfully Submitted,

Dated: October 17, 2023

/s/
Christopher H. White
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone: (312) 353-7390
Facsimile: (312) 353-7398

Sharan Lieberman (LiebermanS@sec.gov)
(*pro hac vice* application forthcoming)
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
Phone: (303) 844-1000
Facsimile: (303) 297-1730

Attorneys for Plaintiff
U.S. Securities and Exchange Commission